Steven G. Storch (SS5241)
STORCH BYRNE LLP
437 Madison Ave.
24th Floor
New York, NY 10022
212-931-1005
sstorch@storchbyrnelegal.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENISE FERRIS,<br><br>                    Plaintiff,<br><br>       - against -<br><br>COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK and HANY G. AYOUB,<br><br>                    Defendants. | Case No. 24 Civ. _____<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff, Denise Ferris ("Ferris"), by her undersigned counsel, as and for her complaint brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"); Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX"); the New York State Human Rights Law, NY Executive Law § 296 (the "NYSHRL"); the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101, *et seq*. (the "NYCHRL"); and common law,, against Defendants Columbia University in the City of New York ("Columbia') and Hany G. Ayoub ("Ayoub") (Ayoub and Columbia are sometimes collectively referred to herein as "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action by a 61-year-old architect whose career was ruined by a misogynistic supervisor and by her employer, Columbia University, which failed to abide by its own policies to protect her. Instead of promptly investigating her complaint of gender-based discrimination, Columbia repeatedly delayed and subjected Plaintiff to a more than a 10-month excruciating wait while the matter was supposedly being investigated. Even after Plaintiff advised that the inordinate delay was empowering the supervisor to continue his wrongful conduct, Columbia still took no action, except in one regard: Columbia terminated her before it completed the investigation and justified it on the basis of the very facts about which Plaintiff had complained.

2.      In fact, Plaintiff was terminated just days after one of her reports filed a formal sexual harassment claim against Plaintiff's supervisor after Plaintiff, fulfilling her duties under Columbia's policy, reported that the employee was also being sexually harassed. The purported justifications for terminating Ferris were demonstrably pretextual because, if they had been the reason for the termination, then she could not have been given the merit raise that Columbia had just awarded her.

3.      Nor was Plaintiff the sole victim of this complete disregard by Columbia of the right of its female employees to be treated fairly and with respect. Multiple women filed complaints with Columbia about the supervisor's conduct, at least one expressing fear that by doing so she would be subjected to retaliation, and Columbia still failed to rein in the misconduct. In fact, at least three female employees finally gave up any hope that Columbia would do anything to address the situation and were effectively constructively terminated.

4.      Columbia's apparent excuse that it is overwhelmed with discrimination claims and cannot keep up with backload is no excuse at all. Its system for protecting victims of gender-based discrimination is a shambles. Its own actions here -- terminating Plaintiff for having complained about gender-based discrimination -- show malice or deliberate indifference to the welfare of its female employees.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction under 28 U.S.C. § 1331, because federal questions are presented, and it has supplemental jurisdiction over the State law claims under 28 U.S.C § 1367(a).

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and omissions giving rise to the claims occurred in this District.

## THE PARTIES

7.      Ferris is an individual residing in Waccabuc, New York.

8.      Defendant Columbia is a private Ivy League research university in New York City, with its Manhattanville Campus located between 125th and 133rd Streets and between Broadway and 12th Avenue.

9.      Defendant Ayoub is an individual residing, upon information and belief, in New Jersey and who was, at all relevant times since October 2022, the Deputy Vice President ("DVP") of the Manhattanville Development Group within Columbia and the direct supervisor of Ferris.

## COMMON ALLEGATIONS

### A.     Background and First Three Years of Work with Columbia University

10.     Plaintiff Ferris is a licensed architect with a Master's Degree in Architecture from the Massachusetts Institute of Technology and is registered with The American Institute of Architects ("AIA"), is a LEED Accredited Professional ("LEED AP"), and is a member of The Association of University Architects ("AUA").

11.     In July 2019, after over 30 years of experience as an architect, Ferris was hired by Columbia as its Associate Vice President ("AVP") of Design and the lead "in-house" architect for the Manhattanville Development Group ("MDG"), which is part of Columbia's Facilities and Operations Department ("CUFO").  Columbia had recruited Ferris from Levien & Company, a specialized and highly regarded real estate development and project management consulting firm in New York City, where she served as a Consultant Architect and Senior Project Manager for fourteen years.  Ferris had previously worked for five years as a Senior Project Manager within Harvard University following fourteen years of architectural practice within several architectural firms.

12.     In her role as AVP, Ferris was responsible for the management of the design process and the design team during the course of a project's initiation and through to its final development.

13.     When Ferris was hired, Defendant Ayoub was the AVP for Project Management and both he and Ferris reported to Marcelo Velez ("Velez"), the Vice President of MDG.

14.     In or about, January 2021, Velez went on administrative leave and ultimately did not return to Columbia.  During the approximately year-and-a-half that she had worked for Velez, Ferris received glowing reviews and above average merit salary increases, with Velez noting in his

November 2020 performance review that her "[p]erformance meets expectations, and at times, exceeds them," stating that "[Ferris's] performance has been very strong. Her strong communications skills, broad [project management] background, and collaborative approach has, in just a few months, helped redefine the role of 'Design Management' in MDG."

15.     From January 2021 to October 2022, both Ferris and Ayoub reported to David Greenberg ("Greenberg"), the Executive Vice President of CUFO, who had been Velez's supervisor. During the almost two years that she reported to Greenberg, Ferris continued to receive glowing reviews and, while the reviews were undocumented, Greenberg's recommendation of a greater-than-average salary increase and what is very rare at Columbia, a bonus, speak for themselves. A greater than average merit increase required that Ferris exceed expectations.

16.     In October 2022, Ayoub was promoted from AVP to Deputy Vice President ("DVP") and became Ferris's supervisor, but Ferris's role was otherwise unchanged.

### B.     Ayoub Demonstrates That He Has A Problem With Women

17.     Once Ayoub assumed the role of DVP, he used his power to demean, insult and humiliate the women who worked for him, including Ferris. No less than four other women were either driven from employment and/or filed complaints as a result of Ayoub's gender-based misconduct, a fact known to Columbia's Central and CUFO Departments of Human Resources ("HR") as well as its Office of Equal Opportunity and Affirmative Action ("EOAA").

18.     While Ayoub would publicly demean, insult, and humiliate the women who worked for him, he did not treat the men who worked for him the same way. If he berated the men at all, he did so only in private. And Ayoub favored the men by assigning even unqualified men to

oversee the women or by giving the men an equal vote as to matters in which they should not have had input at all.

19.     Ayoub's first significant public humiliation of Ferris occurred on January 24, 2023, just three months after his elevation to DVP.  During a meeting with members of both MDG and a CUFO procurement team to discuss an architectural study that Ferris was organizing, Ayoub started shouting at Ferris that he would not tolerate her "negotiating with his own team" about the project schedule, humiliating her in front of approximately 12 attendees. Colleagues later commented to Ferris about how upsetting the incident was for them to see.

20.     Less than two months later in March 2023, outraged that Ferris had called attention to an imbalance in MDG's procurement procedures, and equally outraged by the likely outcome of the process, Ayoub abruptly called a meeting with Ferris and a female colleague (to maintain her privacy, she will be referred to herein as "Female Colleague A"), and two men, AVP Phil Kretzmer ("Kretzmer") and Greg Lempin ("Lempin"), a civil engineer.  For over two-and-a-half hours Ayoub raged at the two women in attendance, falsely accusing them of "disrespecting the process" and of behaving unethically. Among other things, Ayoub questioned Ferris' integrity regarding her search for a consultant architectural firm, suggesting that she revisit the due-diligence process, undermining her ability and authority to do her job within her area of expertise and responsibility. That verbal assault left Ferris literally shaking and it was the first time she felt professionally and physically vulnerable. Female Colleague A was likewise unnerved and was to quit six months later, after continuing to suffer similar abuse from Ayoub.

21.     On March 23, 2023, still shaken-up from the meeting on March 14, Ferris scheduled the first of three appointments with the Columbia's Ombuds Office concerning Ayoub, where she spoke with Marilyn Molina.  During this meeting, Ferris described the hostile environment created

by Ayoub, but declined to file a formal complaint in the ultimately vain hope that things would improve. Ferris does not know whether that or subsequent conversations were disclosed to Ayoub.

22.    Things did not improve. Ayoub continued to target the women and undermine them professionally while promoting men who had been subordinate or unqualified.

23.    For example, on April 12, 2023, after Ferris had completed negotiation of a contract with an architectural firm, Ayoub interjected himself into the matter even though full responsibility had been assigned to Ferris and she had already secured a discount that exceeded financial objectives for the project. Ayoub then proceeded to unilaterally threaten to withhold the contract that Ferris had just negotiated unless the vendor acquiesced in an additional discount, thereby gratuitously making Ferris appear incompetent to her colleagues and as lacking authority to Columbia's vendor.

**C**. **Ayoub Further Undermines Plaintiff**

24.    In or about July 2023, some eight months after Ferris began reporting to Ayoub, Ferris learned that she would not be receiving a merit raise. Merit raises were given to employees that "meet expectations" and at that time averaged 3.35%. Upon information and belief, the determination of a merit raise was based solely on Ayoub's recommendation.

25.    Also in July 2023, AVP Phil Kretzmer left Columbia; until then, Ayoub had scheduled periodic "Executive Meetings" with Kretzmer and Ferris. Once Kretzmer left, Ferris and Ayoub were the remaining "executives," but Ayoub refused to continue those meetings with Ferris. Ayoub began excluding Ferris from other regular meetings as well.

26.    Thus, Ferris was subsequently disinvited from the "Principals Meetings" for the 600 West 125th St. project and repeatedly told that she was neither needed nor welcome at those

meetings anymore. She was similarly excluded from all initial design conversations (with leadership and within MDG internally) concerning the "Escalator Replacement Project" and then accused by Ayoub of not doing her job because she was not participating in the project.

27.    On August 3, 2023, explaining why she did not receive a merit raise, Ferris received her first-ever negative performance evaluation at Columbia, a highly personalized series of false accusations delivered orally by Ayoub (with Annette Lopes, the head of CUFO Human Resources, in attendance). A month-and-a-half later, on September 19, 2023, Ferris received Ayoub's written review. After requesting time to respond in writing, Ferris submitted her response to Columbia's Human Resources Department on November 9, 2023, together with 185 pages of supporting documentation which demonstrated that Ayoub was simply lying.

28.    Ayoub's review notably employed "coded language" that masks discriminatory meaning. Thus, instead of complementing Ferris for being assertive, Ayoub, accused her of employing a "demeanor of disrespect" by "expressing vocal disagreement" with him.

29.    Similarly, Ayoub charged that that Plaintiff has a "lack of executive presence," another coded phrase.

30.    Christopher Lee in Columbia's HR Department noted that Ferris's response to Ayoub's review had identified gender-based discrimination and he reached out to Ferris to let her know that he was forwarding her response to Columbia's Office of Equal Opportunity and Affirmative Action (the "EOAA") because it "needs to be made aware of such cases."

31.    As a consequence, and because Ayoub's harassment was impairing her ability to perform her job, Ferris filed a formal complaint with the EOAA on January 7, 2024.

### D. **Ferris's EOAA Complaint Goes Nowhere**

32.    Ferris met with EOAA staff on January 11 and 13, 2024.  By letter dated January 25, 2024 (annexed hereto as Exhibit A) Columbia's EOAA provided official notice of its ensuing investigation, promising a "thorough and impartial investigation" and stating that it "is the goal of EOAA to complete its investigation within 120 days from this date of the formal investigation notice," *i.e.*, by May 24, 2024.  It promised that Ferris "will receive a status update at 60 days and every 30 days thereafter."

33.    According to Columbia's EOAA handbook (at p. 28), that investigation would not have been commenced unless there first had been a determination that, "if substantiated, the alleged misconduct would violate EOAA Policies & Procedures."

34.    Contrary to its own announced promise to Ferris in the EOAA's notice of investigation, Columbia did not send the periodic updates and did not provide any updates at all until Ferris affirmatively and repeatedly had to reach out and demand them.  However, the reports provided were never substantive and simply reported vaguely that the investigation was still ongoing, or that it was still ongoing but delayed.

35.    Contrary to its own announced "goal," Columbia did not complete its investigation within 120 days.  In fact, when Columbia fired Ferris 244 days after the investigation was formally confirmed to have begun, on September 25, 2024, the investigation still had not been completed.

36.    Meanwhile, aside from using it as an excuse to deny Ferris a merit raise, Columbia never gave Ayoub's review of Ferris any credence.  Ferris was never given the coaching and training that Ayoub's written review called for and which Columbia, as a matter of policy, would have provided in the ordinary course when there were actual deficiencies in performance.

37.    Nevertheless, despite the pendency of its investigation, Columbia left Ferris in the position of having to continue reporting to Ayoub and did nothing to ameliorate Ayoub's harassment of Ferris and other women which continued unabated, if not intensified, thereafter.

38.    For example, in August and September 2023, Ayoub insisted that a less qualified male colleague, Lempin, accompany Ferris at all times when she vetted architectural firms and he gave Lempin a vote equal to Ferris's on which firms to select.  Lempin, however, was a civil engineer, not an architect, and as such was normally viewed in the industry as unqualified to be participating in such architectural decisions.  Ayoub similarly began relying on Lempin and another male engineer, Jim Sugaste, for architectural process and design advice instead of Ferris, even though neither was qualified or experienced in overall design processes and in architectural design in particular.

39.    On August 31, 2023, Ferris learned that a male Executive Director would be covering for Ayoub during an upcoming EVP staff meeting whilst Ayoub was away from the office, despite prior practice being that an AVP would routinely cover such a meeting.  At the time, Ferris was the available AVP, was more qualified than the Executive Director to conduct the meeting, and even had to provide him with his talking points for the meeting.

40.    On September 13, 2023, Female Colleague A resigned because she could no longer tolerate Ayoub's treatment of women.  Upon information and belief, not wanting to burn bridges at Columbia, a school she had attended as both an undergraduate and a graduate student, Female Colleague A did not file a formal complaint.

41.    On December 1, 2023, understanding that to have been what Ayoub wanted when he accelerated the draft submission schedule, Ferris sent draft presentation materials directly to

Ayoub's superior, David Greenberg.  Ayoub reprimanded Ferris by email **and also** gratuitously copied Ferris's **subordinates** on the email. On December 4, 2023, in the continuing discussion, Ayoub again gratuitously copied Ferris's subordinates.

E.    **Defendants Retaliate Against Ferris**

42.    In July 2024, at the beginning of Columbia's new fiscal year, Ayoub notified Ferris that she would receive the standard merit salary increase that year which, under Columbia's policy, necessarily meant that Ferris' performance since her prior review "met expectations."  Ayoub's formal performance review was to be provided by the end of August.

43.    Ayoub never provided that performance review, because Ferris filed another complaint and, suddenly, her performance no longer met Ayoub's expectations.

44.    On August 7, 2024, Ferris had another call with an EOAA investigator to discuss Ayoub's ongoing harassment of her as well as against her new female colleague ("Female Colleague B"), a licensed architect with over twenty years' experience, who began working at MDG in April 2024 and almost immediately began to experience Ayoub's hostility towards women.  As Female Colleague B's supervisor, Ferris had a duty to report the sexual harassment of which she was aware.

45.    At that August 7 meeting, Ferris was told by the EOAA investigator that if her new allegations of harassment were determined to be unrelated to her prior complaint, then she should expect the investigator's report to be issued shortly.  If, however, it was determined that Ayoub's behavior were *related* to the complaint Ferris had filed in January, then the clock would reset, and no report would issue on the initial complaint until the conclusion of the investigation of the new allegations.  Obviously, that is absurd: if every new incident of harassment restarted an

investigation, no investigation of a serial harasser would ever be completed.  But that was subsequently confirmed in writing to be Columbia's approach.

46.     By letter dated August 15, 2024, the EOAA claimed to initiate a further investigation of Ayoub's additional misconduct and stated that the goal was to now complete its investigation of Ferris's "updated complaint" within the next 120 days.  (A copy of the August 15, 2024, letter from the Associate Director of the EOAA is annexed hereto as Exhibit B without its attachment.)

47.      On September 21, 2024, Female Colleague B informed Ferris that she had filed her own complaint against Ayoub with the newly created Office of Institutional Equity ("OIE"). Female Colleague B provided Ferris with a copy of her complaint which set forth Ayoub's mistreatment of women and favoritism toward men.  Female Colleague B further informed Ferris that she sent an email to CUFO HR requesting a meeting as soon as possible as she was concerned about retaliation by Ayoub.

48.     Four days later, on September 25, 2024, at approximately 2.00pm, Ferris was fired during a six-minute Zoom call with Ayoub and Annette Lopes of Human Resources.  When Ferris mentioned the ongoing EOAA investigation and suggested that this termination constituted extreme retaliation, Lopes denied having any participation in the EOAA process.

49.     Ferris did not receive a written statement of the reasons for her termination until two weeks later.  The reasons given for terminating Ferris were not merely pretextual, they assumed the truth of Ayoub's false accusations against Ferris that Columbia had supposedly been investigating at that point for over 244 days.

50.     On October 21, 2024, Ferris filed a complaint with the federal Equal Employment Opportunity Commission, and she received a "right to sue letter" dated October 31, 2024.  This complaint is being filed less than 90 days thereafter.

51.     By letter dated November 26, 2024, sent only after Columbia received a copy of Ferris's EEOC complaint, and only after Ferris's attorneys let Columbia's counsel know that the instant complaint would be forthcoming, Columbia's EOAA informed Ferris's counsel that it had completed its investigation and that it found no violations of Columbia's *Equal Opportunity and Affirmative Action Policies and Procedures.*

### AS AND FOR
### A FIRST CAUSE OF ACTION
**(Against Columbia -- Discrimination on the Basis of Gender in Violation of Title VII, 42 U.S.C. § 2000e-2(a), and/or Title IX, 20 U.S.C. § 1681(a))**

52.     Ferris repeats each and every allegation contained in paragraphs 1 through 51, above, as though set forth in full again herein.

53.     Ayoub, as Deputy Vice President, was an upper-level manager/executive at Columbia. At all relevant times, Ayoub acted as Ferris's direct supervisor.

54.     Ayoub subjected Ferris to sexual harassment and discrimination which was severe and pervasive and which resulted in a hostile work environment and in Ferris being treated differently than her male counterparts in respect to the terms, conditions, and privileges of her employment as evidenced, *inter alia,* by his exclusion of Ferris from meetings to which her male colleagues were invited; verbal abuse of Ferris and other women but not of men; termination of Ferris for false and pretextual reasons; and humiliation of Ferris by having her work vetted by less qualified men.  Said conduct rendered it unreasonably difficult for Ferris to do her job and constituted a material adverse employment action.

55.     Columbia was on notice that Ayoub had created a hostile work environment for women within MDG and, for more than 244 days, was specifically aware that Ferris and other women had filed discrimination complaints based on Ayoub's continuing behavior.  Nevertheless, Columbia took no steps to protect any of the women until immediately after Ferris had been terminated, at which time Columbia re-worked MDG's reporting structure so that Female Colleague B and another affected woman, "Female Colleague C," would not have to report to Ayoub.

56.     In discriminating against Ferris on the basis of her gender as alleged herein, Defendants acted in a willfully and/or wantonly negligent and/or reckless manner, and/or exhibited a conscious disregard of, and deliberate indifference to, violations of Ferris's rights under the anti-gender discrimination provisions of the Title VII and Title IX, and other statutes.

57.     Defendants' discriminatory actions have caused, and will continue to cause Ferris to suffer, irreparable and significant damage to her personal and professional good name and reputation, and the severe and lasting embarrassment, humiliation and anguish that accompanies it, as well as substantial financial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

**AS AND FOR**
**A SECOND CAUSE OF ACTION**
**(Against Columbia and Ayoub-- Discrimination on the Basis of Gender in Violation of NYSHRL§ 296(1)(a)) and NYCHRL § 8-107)**

58.     Ferris repeats each and every allegation contained in paragraphs 1 through 57, above, as though set forth in full again herein.

59.     Defendants violated the NYSHRL and/or the NYCHRL by subjecting Ferris to inferior terms, conditions, or privileges of employment because she is a woman.

60.    Defendants terminated Ferris's employment because she is a woman.

61.    In discriminating against Ferris on the basis of her gender as alleged herein, Defendants acted in a willfully and/or wantonly negligent and/or reckless manner, and/or exhibited a conscious disregard of, and deliberate indifference to, violations of Ferris's rights under the anti-gender discrimination provisions of the NYSHRL and NYCHRL and other statutes.

62.    Defendants' discriminatory actions have caused, and will continue to cause Ferris to suffer, irreparable and significant damage to her personal and professional good name and reputation, and the severe and lasting embarrassment, humiliation and anguish that accompanies it, as well as substantial financial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

**AS AND FOR**
**A THIRD CAUSE OF ACTION**
**(Against Columbia -- Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a) and/or Title IX, 20 U.S.C. §1681(a))**

63.    Ferris repeats each and every allegation contained in paragraphs 1 through 62, above, as though set forth in full again herein.

64.    Based upon the aforementioned facts, Ferris had reasonable belief that Ayoub was engaged in unlawful conduct under Title VII and/or Title IX.

65.    Ferris's good faith complaints to Columbia of the sexual harassment and discrimination by Ayoub that she was enduring and then, subsequently, of the harassment and discrimination by Ayoub to which Female Colleague B was also subjected, constituted protected activities under Title VII and/or Title IX.

66.     Ferris was fired because she did not merely report that unlawful conduct on her own behalf, but because she also filed one on Female Colleague B's behalf and then encouraged Female Colleague B to file her own.  Female Colleague B's actually filing her own complaint was the last straw for Defendants, and they fired Ferris within a week thereafter.

67.     Defendants' firing Ferris because of her reports of sexual harassment and discrimination was a violation of Title VII and/or Title IX.

68.     In retaliating against Ferris for having reported Ayoub's conduct, Defendants acted in a willfully and/or wantonly negligent and/or reckless manner, and/or exhibited a conscious disregard of Ferris's rights under the anti-retaliation provisions of the Titles VII and IX, and other statutes.

69.     Defendants' retaliation has caused, and will continue to cause Ferris to suffer, irreparable and significant damage to her personal and professional good name and reputation, and the severe and lasting embarrassment, humiliation and anguish that accompanies it, as well as substantial financial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

**AS AND FOR**
**A FOURTH CAUSE OF ACTION**
**(Against Columbia and Ayoub -- Retaliation in violation of NYSHRL § 296(7) and/or NYCHRL § 8-107)**

70.     Ferris repeats each and every allegation contained in paragraphs 1 through 69, above, as though set forth in full again herein.

71.     Based upon the aforementioned facts, Ferris had reasonable belief that Ayoub was engaged in unlawful conduct under the NYSHRL and/or the NYCHRL.

72.    Ferris's good faith complaints to Columbia of the sexual harassment and discrimination by Ayoub that she was enduring and then, subsequently, of the harassment and discrimination by Ayoub to which Female Colleague B was also subjected, constituted protected activities under the NYSHRL and the NYCHRL.

73.    Ferris was fired because she did not merely report that unlawful conduct on her own behalf, but because she also filed one on Female Colleague B's behalf and then encouraged Female Colleague B to file her own.  Female Colleague B's actually filing her own complaint was the last straw for Defendants, and they fired Ferris within a week thereafter.

74.    At a minimum, Ferris's good faith complaints against Ayoub, on her own behalf and on Female Colleague B's behalf, were motivating factors for her termination.

75.    In retaliating against Ferris for having reported Ayoub's conduct, Defendants acted in a willfully and/or wantonly negligent and/or reckless manner, and/or exhibited a conscious disregard of Ferris's rights under the anti-retaliation provisions of the NYSHRL and NYCHRL and other statutes.

76.    Defendants' retaliation has caused, and will continue to cause Ferris to suffer, irreparable and significant damage to her personal and professional good name and reputation, and the severe and lasting embarrassment, humiliation and anguish that accompanies it, as well as substantial financial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

## AS AND FOR
## A FIFTH CAUSE OF ACTION
**(Against Columbia – Failure to Comply With Grievance Procedures Under Title IX, 20 U.S.C. § 1681(a))**

77.     Ferris repeats each and every allegation contained in paragraphs 1 through 76, above, as though set forth in full again herein.

78.     Columbia publishes a handbook for students and employees called the "*OFFICE OF EQUAL OPPORTUNITY & AFFIRMATIVE ACTION POLICIES & PROCEDURES*" (the "EOAA Policies," a copy of which, as updated September 14, 2023, is annexed to Columbia's January 25, 2024, letter which is Exhibit A hereto). Under Columbia's EOAA Policies, Ferris's formal complaint to the EOAA in January 2024 identified conduct by Ayoub and Columbia that was actionable under Title IX and should have been handled under Columbia's "Interim Title IX Grievance Process" described therein (the "Grievance Process").

79.     Instead, Columbia purported to adopt only the 120-day deadline applicable to the Grievance Process, but otherwise conducted its investigation as a standard formal investigation by the EOAA. In determining to not employ the Grievance Process, Columbia deprived Ferris of basic due process rights, including those guaranteed by United States Department of Education regulations, 34 C.F.R. § 106.45. The failure to adhere to the Grievance Process deprived Ferris of the rights to, among other things, participate in a hearing, examine the evidence, cross-examine witnesses, and call experts and character witnesses, all of which should have been made available and all of which were required both by the federal regulations and by Columbia's own policies.

80.     The Grievance Process requires that it "will conclude no later than 120 calendar days," after the complaint is filed, absent "good reason." Columbia's investigation of Ferris's complaint should have been completed well within 120 calendar days.

18

81.    Columbia's investigation of Ferris's complaint was not completed even after 244 days, even though no "good reason" was ever identified.

82.    The Grievance Process requires that, "[d]uring a Title IX investigation, EOAA will record interviews of all Parties and any witnesses," and that "[t]hese recordings will be made available to the Parties for inspection and review."

83.    No recordings of interviews were ever made available to Ferris for inspection and review.

84.    The Grievance Process requires that, "[p]rior to the completion of the Title IX Investigation, the Parties will have an equal opportunity to inspect and review the evidence obtained through the investigation. The purpose of the inspection and review process is to allow each Party the equal opportunity to meaningfully respond to the evidence."

85.    Ferris was never given an opportunity to inspect and review the evidence gathered by Columbia before the completion of its investigation.  Ferris was never asked to respond to any assertions made by Ayoub or other witnesses during the investigation.

86.    The Grievance Process provides (as does Columbia's non-Title IX process) that a complaining party, such as Ferris, is entitled to receive, during the investigation and hearing on her complaint, "[s]upportive measures [which] are designed to restore or preserve equal access to the University's education program or activity (including employment) without unreasonably burdening any Party, including measures designed to protect the safety of all Parties or the University's educational environment, or deter sexual harassment."

87.    No supportive measures were made available to Ferris and, instead, Columbia permitted Ayoub to fire Ferris predicated on the very falsehoods she had cited as examples of Ayoub's sexual harassment.

88.    Columbia's failure to adhere to its own Grievance Process is itself a violation of Title IX.

89.    Even if the Grievance Process were not applicable, Ferris was still entitled to a fair and equitable investigation by the EOAA.  The investigation Ferris received was unfair, inadequate and biased.

90.    Upon information and belief, the claims brought a few years prior by a student wrongly accused of sexual discrimination, which claims Columbia had been forced to settle, resulted in its EOAA and its investigators becoming overly solicitous of men accused of sexual wrongdoing and, consequently, biased against their female accusers.  *See e.g., Columbia Settles With Student Cast as a Rapist in Mattress Art Project*, New York Times, July 14, 2017, p. A-1.

91.    Indeed, of the four witnesses investigators interviewed in connection with Ferris's complaint, only one was a woman, and that witness in fact confirmed that Ayoub treated women differently than men.

92.    Even though Ferris identified Female Colleague B as also being victimized by Ayoub in her interview with the EOAA on August 7, 2024, and even though Female Colleague B subsequently filed her own discrimination complaint against Ayoub, and even though Female Colleague B's fear of retaliation by Ayoub led Columbia to change its reporting structure so that she and Female Colleague C would not have to report to Ayoub after Ferris was fired, the EOAA never interviewed Female Colleague B or Female Colleague C.

93.     Even though the EOAA confirmed by letter dated August 15, 2024, that it was opening an investigation into Ayoub's conduct since the date of Ferris's initial complaint (and would be restarting the long expired 120-day clock), they interviewed only a single witness after that date and before concluding the investigation.  That individual, Phillip Kretzmer, necessarily knew nothing about what had transpired since Ferris had filed her original complaint in January 2024, because he had left MDG six months before, in July 2023.  In other words, **Columbia conducted no investigation at all** of the discriminatory acts identified in the EOAA's August 15, 2024, letter, before somehow concluding that there had been no discrimination.

94.     Columbia's failure to adhere to its own Grievance Process was itself discriminatory and has caused, and will continue to cause, Ferris to suffer irreparable and significant damage to her personal and professional good name and reputation, and the severe and lasting embarrassment, humiliation and anguish that accompanies it, as well as substantial financial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

**AS AND FOR
A SIXTH CAUSE OF ACTION
(Against Columbia –Breach of Contract)**

95.     Ferris repeats each and every allegation contained in paragraphs 1 through 94, above, as though set forth in full again herein.

96.     Columbia's EOAA Policies provide that "[a]ll University employees are expected to read, understand and adhere to" those Policies and promises that "Columbia's Complaint, Investigation, Adjudication, and Appeals Procedures:" and its "Interim Title IX Grievance Process" would be utilized, as appropriate, for addressing violations of those Policies.

97.    The EOAA Policies were attached to the EEOA's January 25, 2024, and August 15, 2024, letters to Ferris confirming the investigation of Ferris's complaints, and again attached to the EEOA's November 26, 2024, letter terminating the investigation.

98.    The EOAA Policies were a term of Ferris's employment by Columbia. Both Columbia and Ferris agreed to abide by those policies, and both gave consideration for the agreement by continuing their employment relationship subject to those Policies.

99.    Had Columbia complied with its own EOAA Policies, Ferris would have been protected from Ayoub's retaliation and a hearing would have illuminated his harassment of Ferris.

100.    In not abiding by its EOAA Policies, Columbia breached its contract with Ferris.

101.    Columbia's breach of contract has caused, and will continue to cause, Ferris to suffer substantial financial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits, suffer irreparable and significant damage to her personal and professional good name and reputation, and the severe and lasting embarrassment, humiliation and anguish that accompanies it.

WHEREFORE, Ferris prays for judgment as follows:

A.    On her First Cause of Action, awarding Ferris judgment against Columbia in an amount to be determined at trial, but in no event less than $5,000,000 in compensatory damages, plus punitive damages (or the maximum permitted under the statutory cap, if applicable) together with reasonable attorneys' fees and expenses, and pre- and post-judgment interest;

B.    On her Second Cause of Action, awarding Ferris judgment against Columbia and Ayoub, jointly and severally, in an amount to be determined at trial, but in no event less than

$5,000,000 in compensatory damages, plus punitive damages, together with reasonable attorneys' fees and expenses, and pre- and post-judgment interest;

C.      On her Third Cause of Action, awarding Ferris judgment against Columbia in an amount to be determined at trial, but in no event less than $5,000,000 in compensatory damages, plus punitive damages (or the maximum permitted under the statutory cap, if applicable) together with reasonable attorneys' fees and expenses, and pre- and post-judgment interest;

D.      On her Fourth Cause of Action, awarding Ferris judgment against Columbia and Ayoub, jointly and severally, in an amount to be determined at trial, but in no event less than $5,000,000 in compensatory damages, plus punitive damages, together with reasonable attorneys' fees and expenses, and pre- and post-judgment interest;

E.      On her Fifth Cause of Action, awarding Ferris judgment against Columbia in an amount to be determined at trial, but in no event less than $5,000,000 in compensatory damages, plus punitive damages, together with reasonable attorneys' fees and expenses, and pre- and post-judgment interest;

F.      On her Sixth Cause of Action, awarding Ferris judgment against Columbia in an amount to be determined at trial, but in no event less than $5,000,000 in compensatory damages, and pre- and post-judgment interest; and

G.      On all Causes of Action, additionally awarding Ferris such other and further relief the Court deems just and proper.

### Jury Demand

Ferris hereby demands trial by jury of all matters so triable.

Dated: New York, New York

23

December 18, 2024

STORCH BYRNE LLP

By:_____
    Steven G. Storch (SS5241)
437 Madison Ave.
24th Floor
New York, NY 10022
212-931-1005
sstorch@storchbyrnelegal.com
*Attorneys for Plaintiff*